1  Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
2  Erik C. Fritz (SBN 337341) *ef@mckennonlawgroup.com*
   **McKENNON LAW GROUP PC**
3  20321 SW Birch Street, Suite 200
   Newport Beach, California 92660
4  Phone:  949-387-9595  |  Fax:  949-385-5165

5  Attorneys for Plaintiff, SALVADOR ZAVALA

6

7

8               **UNITED STATES DISTRICT COURT**

9     **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

10



11  SALVADOR ZAVALA,                          Case No.:

12                                            Action File:
                    Plaintiff,
13                                            Trial Date:
    vs.
14                                            _____
    SEDGWICK CLAIMS
15  MANAGEMENT SERVICES, INC.;   **COMPLAINT FOR RECOVERY OF**
    PACIFIC BELL TELEPHONE        **ERISA PLAN BENEFITS;**
16  COMPANY; and DOES 1 through 10, **ENFORCEMENT AND**
    inclusive,                     **CLARIFICATION OF RIGHTS; PRE-**
17                                 **JUDGMENT AND POST-JUDGMENT**
                                   **INTEREST AND ATTORNEYS' FEES**
18                  Defendants.
                                   [Filed Concurrently With:
19                                   -  Civil Cover Sheet;
                                     -  Summons; and
20                                   -  Certification of Interested Parties]

21

22

23

24

25

26

27

28

## JURISDICTION AND VENUE

1.     Plaintiff Salvador Zavala ("Mr. Zavala" or "Plaintiff") brings this action to recover benefits and to enforce and clarify his rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B).  This Court has subject matter jurisdiction over Plaintiff's claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.

2.     Venue lies in the Central District of California, Eastern Division pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this district, some of the alleged breaches occurred in this district, and the ERISA-governed plan at issue was administered in part in this district. Venue is also proper pursuant to 28 U.S.C. Section 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred within this district; namely, Defendants denied Plaintiff's claim within this district.

## THE PARTIES

3.     Plaintiff is an individual who, at all times relevant to this action, was a citizen of the State of California, a resident of the City of Chino in San Bernardino County.  Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA Section 3(7), 29 U.S.C. Section 1002(7), in the employee welfare benefit plan established by his former employer Defendant Pacific Bell Telephone Company ("Pacific Bell"), and Pacific Bell's parent company, AT&T Inc., which plan is at issue in this action.

Case No.:

4.    Defendant Pacific Bell is, and at all times relevant was, a California corporation with its principal place of business located in San Francisco, California. Pacific Bell provides telephone services in California. Pacific Bell is an indirect, wholly owned subsidiary of AT&T Inc. Pacific Bell is one of the many affiliate companies that participate in AT&T Inc.'s employee welfare benefit plan. Pacific Bell, at all times relevant, administered the AT&T Umbrella Benefit Plan No. 1 and/or No. 3 ("Umbrella Plan"), which is its comprehensive employee welfare benefit plan governed by ERISA. The Umbrella Plan combines numerous group short-term and long-term disability, medical, dental, vision, prescription drug, life insurance, and accidental death and dismemberment plans sponsored by various AT&T Inc. affiliate companies (each a "Program") into one welfare benefit plan. One of the component Programs of the Umbrella Plan is the AT&T Disability Income Program for Management Employees ("Disability Program"), which provides short-term disability benefits, long-term disability benefits, and vocational rehabilitation benefits to eligible employees (of participating AT&T Inc. affiliate companies such as Pacific Bell) who become disabled and unable to work. Pacific Bell is responsible for paying the full cost of the Disability Program as part of its employees' benefits. The Disability Program is itself an employee welfare benefit plan governed by ERISA. The Umbrella Plan, Disability Program, Summary Plan Description ("SPD") for the Disability Program and all other plan contract documents are hereinafter referred to collectively as the "Plan."

5.    Defendant Pacific Bell is, and at all times relevant was, a participating company in the Plan's Disability Program and responsible to fund the Disability Program's benefits, including its long-term disability ("LTD") benefits for its employees like Plaintiff. The Plan, including the Disability Program, promised to pay LTD benefits to Plaintiff should he become disabled. Pacific Bell is and was the funding source of the disability benefits owed to its employees under the Plan

1  and, more precisely, the Disability Program, and thus was, on information and
2  belief, a self-funded Plan.  Pacific Bell, at all times relevant, administered LTD
3  benefits provided to its employees, including Plaintiff.  At all times relevant, Pacific
4  Bell has acted as an ERISA claims fiduciary of the Plan in connection with LTD
5  benefits and the pertinent Plan documents.

6

7       6.     Defendant Sedgwick Claims Management Services, Inc. ("Sedgwick")
8  is, and at all times relevant was, an Illinois corporation with its principal place of
9  business located in Tennessee.  Sedgwick is a third-party claims administrator.  It
10  provides insurance claims administration services to major employers, including in
11  California, for disability benefits offered by employers.  At all times relevant,
12  Sedgwick acted as the claims administrator and as an ERISA claims fiduciary of the
13  Plan in connection with LTD benefits and the pertinent Plan documents.  Notably,
14  Sedgwick was the third-party claims administrator for the Disability Program.  At
15  all times relevant, Sedgwick determined, approved, or denied all claims and appeals
16  for LTD benefits under the Disability Program, including for Plaintiff's disability
17  claim to Pacific Bell under the Disability Program.[1]

18

19       7.     At all times relevant, Defendants Sedgwick and Pacific Bell
20  administered LTD benefits provided to Plan participants, including Plaintiff.  The
21  Disability Program and the Plan promised to pay LTD benefits to Plaintiff should he
22  become disabled.

23

24       8.     The true names and capacities, whether individual, corporate, associate
25  or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are
26  unknown to Plaintiff at this time.  Plaintiff therefore sues DOES 1 through 10 by

27

---

[1] Sedgwick operates the AT&T Integrated Disability Service Center ("AT&T IDSC"), where disability claims from Pacific Bell employees like Plaintiff (and from employees of other AT&T affiliate companies) are administered and decided.

28

Case No.:

1  fictitious names and will ask leave of the Court to amend this Complaint to show the

2  true names and capacities of DOES 1 through 10 when the same are ascertained.

3  DOES 1 through 10 are sued as principals and/or agents, servants, attorneys, or

4  employees of said principals, and all of the acts performed by them were within the

5  course and scope of their authority and employment.  Plaintiff is informed and

6  believes and thereupon alleges that each of DOES 1 through 10 is legally

7  responsible in some manner for the events referred to herein, and directly and

8  proximately caused the damages and injuries to Plaintiff, as hereinafter alleged.

9

10                              **FACTUAL BACKGROUND**

11

12        9.      Mr. Zavala began working for Pacific Bell in March 2003.  At the time

13  when he became disabled (in June 2019), he had worked for Pacific Bell for over 16

14  years and was employed as a "Sales Executive 2 Fiber," a senior sales executive

15  position.  According to his employer's official job description, Mr. Zavala's material

16  job duties included:  Meeting with customers engaged in sales activities at the

17  customer's site; communicating with customers via phone, teleconference, e-mail,

18  etc., related to a proposed solution/sale, etc.; traveling to and from the customer's

19  premises; preparing proposals, presentations, or bids; developing strategic plans

20  related to the customer and the proposed solution/sale; researching and developing

21  customer solutions with ATT external partners, including design and engineering;

22  and researching customer business and industry to identify new sales opportunities.

23

24        10.     Pursuant to the terms and conditions of the Plan, Mr. Zavala is entitled

25  to LTD benefits because he met, and continues to meet, the Plan's operative

26  definition of "disability" and the other conditions necessary to qualify for LTD

27  benefits during the relevant time-period.  The Plan, and specifically the Disability

28  Program, states in pertinent part that:

Case No.:

**When You Are Considered Totally Disabled**

You are considered Totally Disabled for purposes of Company-Provided Long-Term Disability Benefits under this Program[2] when you have an Illness or Injury that prevents you from engaging in any employment for which you are qualified for or may reasonably become qualified based on education, training or experience. You will be considered Totally Disabled for a long-term disability if you are incapable of performing the requirements of a job other than one for which the rate of pay is less than 50 percent of your Pay (prior to any Offsets) at the time your long-term disability started.

However, you are allowed to work and still receive Company-Provided Long-Term Disability Benefits if the job pays less than 50 percent of your Pay before your Total Disability started. The Company Provided Long-Term Disability Benefits payable when added to the pay you receive from working cannot exceed 75 percent of your Pay at the time your long-term disability started.

11.     Under the terms of the Plan, Mr. Zavala is entitled to 60% of his monthly covered earnings plus an additional supplement of 10% of his monthly earnings, including salary, wages and commissions, which, based on his pre-disability salary, is approximately $7,329 per month. The monthly benefit amount can be adjusted to account for other benefits received, and is payable until the date when he reaches age 65, the end of the Maximum Benefit period defined in the Plan.

12.     The Disability Program allows Sedgwick to require Mr. Zavala to submit to an independent medical examination ("IME") by a physician. It states, "In order to be considered for Company-Provided Long-Term Disability Benefits, you must: . . . Report for a medical examination by a Physician designed by the Claims Administrator if the Claims Administrator requires this examination to initially qualify for or continue your Company-Provided Long-Term Disability Benefits."

13.     On June 4, 2019, Mr. Zavala was forced to stop working at Pacific Bell due to debilitating left-sided neck, shoulder, arm, elbow, wrist, and finger pain and numbness, which, by mid-2020, developed into complex regional pain syndrome

---

[2] Pacific Bell is a Participating Company in the Plan and the Disability Program.

Case No.:

1  ("CRPS").  CRPS causes constant debilitating nerve pain on the left side of Mr.

2  Zavala's neck, his left shoulder, and his left hand due to cervicalgia.  Cervicalgia is

3  a condition consisting of a continuous burning pain, stiffness, and weakness that is

4  increased by touching, grabbing, holding, or pulling; Specific to Mr. Zavala,

5  cervicalgia causes him persistent pain in the neck and left shoulder that is

6  exacerbated by continual standing, walking, sitting, or head and neck movement.[3]

7  Mr. Zavala also suffers from osteoarthritis in both knees and associated depression

8  and anxiety from the chronic pain.  Mr. Zavala was actively at work and eligible for

9  disability benefits under the Plan on his last day of work (June 3, 2019) before his

10  date of disability onset.  But as of June 4, 2019, his injuries rendered him totally

11  disabled from working in his own occupation as a Sales Executive 2 Fiber, either

12  with or without accommodations, as well as from any other occupation for which he

13  is qualified for or may reasonably become qualified for based on education, training

14  or experience.

15

16      14.    To date, Plaintiff's problems have not resolved, and unfortunately have

17  gotten worse, due to progression of his CRPS to his left palm, along with

18  osteoarthritis in both of his knees.  He is currently unable to type on a computer

19  keyboard with his left hand, sit with his legs at a 90-degree angle, perform any

20  lifting, or bend his neck, without experiencing severe pain; each of these actions is

21  required by his job or any job that he could perform for which he is qualified by

22  education, training and experience.  He is unable to perform his material job duties

23  because of his chronic, severe neck, shoulder, arm and hand/finger pain and

24  _____

25  [3] CRPS is an uncommon sympathetic nerve pain disorder that is not understood well.  It is a form of chronic nerve pain that usually affects an arm or a leg.  It typically develops after an injury or a surgery.  The pain is out of proportion to the severity of the initial injury.  CRPS may spread from its source to elsewhere in the body, such as the opposite limb.  Its hallmark symptoms include prolonged severe pain that may be constant, often described as "burning," a "pins and needles" sensation, or a feeling as if someone were squeezing the affected limb.  *See https://www.mayoclinic.org/diseases-conditions/complex-regional-pain-syndrome/symptoms-causes/syc-20371151.*

26

27

28

Case No.:

numbness due to CRPS, which pain is exacerbated by bending his neck and any use of his left hand; osteoarthritis in his knees that causes severe pain when sitting with his legs at a 90-degree angle or going up or down steps; and chronic depression and anxiety due to his pain.  Plaintiff's injuries have rendered him totally disabled from working.  Because of his injuries, Plaintiff is and was unable, at all times from June 4, 2019 through the present and continuing, to perform the material duties of his own normal occupation or any other occupation for which he is qualified by education, training, or experience.

15.    After the onset of his disabling injuries, Mr. Zavala took a leave of absence from work, then applied for, and received, STD and then LTD benefits from Defendants for 15 months, from approximately June 4, 2019 to September 15, 2020. As alleged below, however, Defendants then prematurely terminated his LTD benefits while he was still disabled.

16.    As part of his LTD claim, Mr. Zavala provided Sedgwick with any information that it requested, and he granted Sedgwick full access to his medical records.  The medical records continued to support his claim for LTD benefits, as Defendants determined by paying his claim.

17.    In February 2019, Mr. Zavala began to experience numbness in his left arm and hand while lying on his back.  An April 23, 2019 MRI showed a 3.4 mm broad left foraminal protrusion with moderate left neural foraminal stenosis with slight left greater than right central narrowing at C6-C7.

18.    On June 4, 2019, Mr. Zavala had a C6-C7 anterior depression and spinal fusion surgery performed by Dr. Richard Kim., a board-certified neurosurgeon.

Case No.:



19.    On June 27, 2019, Dr. Alan Beyer, a board-certified orthopedic surgeon, evaluated Mr. Zavala, based upon the patient's chief complaint of problems with both knees.  X-rays revealed significant degenerative changes to the medial compartment and patellofemoral compartment on both knees, with the left knee being somewhat less severe.  Dr. Beyer diagnosed Mr. Zavala with a torn right meniscus and ordered an MRI on his right knee.

20.    On August 8, 2019, Dr. Beyer evaluated Mr. Zavala based on the MRI scan of his right knee, which revealed complex tearing of the lateral meniscus as well as significant chondrosis in both the patellofemoral joint and the lateral compartment.  Dr. Beyer gave Mr. Zavala injections of 1 mL xylocaine and 6 mg Celestone and requested that he return in two to three weeks for further evaluation.

21.    On August 22, 2019, Dr. Beyer reevaluated Mr. Zavala, who indicated that he was having significant pain on the lateral side of his right knee, consistent with the meniscal tear.  Given Mr. Zavala's ongoing pain, Dr. Beyer recommended an arthroscopic lateral meniscectomy on Mr. Zavala's right knee, to be scheduled after his bariatric sleeve surgery the following week.

22.    On August 30, 2019, Mr. Zavala underwent a gastric sleeve surgery, in hopes that losing weight would ameliorate his chronic pain.  Unfortunately, it did not.

23.    On September 9, 2019, Mr. Zavala presented to Dr. Kim for a follow-up visit.  He reported sensory changes to his left arm in the forearm and hand following his June 4, 2019 C6-C7 anterior decompression and back fusion surgery.

Case No.:



24.    After a few more routine follow-ups for his torn meniscus, on October 11, 2019, Mr. Zavala had knee surgery performed by Dr. Beyer to repair his meniscus.  The surgery consisted of an arthroscopy, a partial lateral meniscectomy, and debridement of the lateral femoral condyle in his right knee.  Mr. Zavala was diagnosed with a torn lateral meniscus and cartilage damage (arthritis) in the lateral femoral condyle in his right knee.

25.    On October 14, 2019, Mr. Zavala returned to Dr. Kim for another follow-up visit.  He reported that the left arm pain had improved, but the numbness in his left hand persisted.  Given these symptoms, Dr. Kim diagnosed Mr. Zavala with dysesthesias (numbness) in his left hand caused by C6 radiculopathy.

26.    An October 15, 2019 MRI of the cervical spine showed that C6-C7 were decompressed, with mild disc bulges causing mild to moderate foraminal stenosis on the left side at C3-C4, C4-C5, and C5-C6.

27.    On December 13, 2019, Mr. Zavala underwent a second back surgery with Dr. Kim, this time a decompression surgery with laminectomy at C5-C6 and C6-C7.

28.    On December 26, 2019, Mr. Zavala saw Dr. Kim for slightly increased left-arm pain.  Dr. Kim's examination showed continued dysesthesias (numbness) in Mr. Zavala's left hand caused by C6 radiculopathy, with impaired sensation (but full strength) in his left arm.

29.    In response to Mr. Zavala's continuing claim for disability benefits, Sedgwick retained four physician consultants to review his medical records: Howard Grattan, M.D., a physical medicine, rehabilitation, and pain medicine doctor; Ryan

-9-



S. Trombly, M.D., a neurological surgeon; Sherry A. Withiam-Leitch, M.D., a neurologist; and Fariha Qadir, M.D., a psychiatrist. Sedgwick did not ask its medical consultants to perform an IME of Mr. Zavala, just a file "paper" review.

30. On January 20, 2020, Dr. Grattan prepared a report after reviewing Mr. Zavala's medical records. Dr. Grattan never spoke with Mr. Zavala or his treating physicians. Based purely on his file review, Dr. Grattan concluded that "[T]he claimant will be able to return to his regular job duties without restrictions by 06/08/20." This conclusion necessarily means that Dr. Grattan found Plaintiff had significant restrictions and limitations such that he could not work until June 8, 2020. There is no rationale for his conclusion that Plaintiff would suddenly no longer suffer from restrictions and limitations as of June 8, 2020 such that he could return to work.

31. On January 20, 2020, Dr. Trombly prepared a report after reviewing Mr. Zavala's medical records. Dr. Trombly never spoke with Mr. Zavala or his treating physicians. Based purely on his file review, Dr. Trombly concluded that "[T]he claimant should be able to resume his regular job duties without restriction as of 06/08/20."

32. On January 27, 2020, Mr. Zavala saw Dr. Kim again for continuing left-arm pain, post-surgery. He continued to demonstrate impaired sensation in his left arm.

33. A January 27, 2020 X-ray of the cervical spine revealed mild to moderate discogenic disease and facet arthropathy, including at C5-C6 and C7-T1.

Case No.:



34.    On February 21, 2020, Mr. Zavala underwent objective testing: an EMG/NCV (electromyogram), which demonstrated evidence of mild left C6 radiculopathy, consistent with his previous diagnoses.

35.    On April 16, 2020, and continuing regularly thereafter, Mr. Zavala began seeing a psychiatrist, Dr. Todd Ramsey Wojtanowicz, to treat his depression and anxiety.  Dr. Wojtanowicz started Mr. Zavala on 60 mg Cymbalta for his nerve pain and depression, as well as Klonopin 0.5 mg twice per day for his anxiety.

36.    On May 11, 2020, Mr. Zavala presented for a follow-up with Dr. Kim.  Mr. Zavala continued to have persistent dysesthesia on the lateral side of his left hand.  Upon examination, Mr. Zavala demonstrated impaired sensation in his left arm.  Dr. Kim diagnosed him with complex regional pain syndrome (CRPS).

37.    On June 18, 2020, Dr. Witham-Leitch prepared a report after reviewing Mr. Zavala's medical records.  She never spoke with Mr. Zavala or his treating physicians.  Dr. Witham-Leitch specifically found that "The objective findings are supported and consistent with the employee's subjective complaints:  he complains of left arm symptoms that area [*sic*] consistent with the EMG findings of Cervical radiculopathy," but went on to say that "The severity is not sufficient to cause impairment from a sedentary job."  Despite specifically noting Dr. Kim's May 11, 2020 finding of "likely complex regional pain syndrome," she inexplicably limited her assessment to a discussion of cervical radiculopathy, which is far less severe and less permanent than CRPS.

38.    On August 12, 2020, Dr. Qadir prepared a report after reviewing Mr. Zavala's medical records.  Dr. Qadir never spoke with Mr. Zavala or his treating physicians.  Based purely on his file review, which was apparently limited to four



months of Mr. Zavala's psychiatric records, Dr. Qadir concluded that "from a psychiatric perspective, clinical findings do not support functional impairment[,] and disability is not supported[,] and the claimant is not preclude [*sic*] from performing his regular job duties as a Sales Executive from 04/01/20 – present."

39.    Despite the overwhelming medical documentation supporting his disability diagnosis, Defendants terminated Mr. Zavala's LTD benefits as of September 16, 2020 via letter dated September 4, 2020 (which was subsequently amended via letter dated October 15, 2020).  Defendants explained that for Mr. Zavala to continue to qualify for benefits, they "would need clear medical evidence from your current treating provider(s) of how your medical condition limits your ability to perform the essential duties of your occupation and meets your plan's definition of disability."

40.    After Defendants terminated Mr. Zavala's disability benefits, he submitted additional medical records to them that established that he remained disabled as of September 16, 2020 onward, contrary to what Defendants erroneously contended.  Mr. Zavala first provided this report to Sedgwick when he appealed.  Thus, this persuasive information was not available to Sedgwick when Sedgwick initially decided to pay his claim from June 2019 to September 2020 or when it terminated his benefits in September 2020.

41.    On September 17, 2020, Dr. Michael Deanda, a board-certified family medicine doctor, examined Mr. Zavala and completed a residual functional capacity form, providing functional restrictions that would clearly affect Mr. Zavala's ability to perform even sedentary work: "Without proper head and neck support, patient is unable to sit for longer than one hour at a time with one hour of rest in between.  If patient is required to move head or neck, or use arms or hands, patient can only sit

-12-



for 15 min at a time with one hour of rest in between." Dr. Deanda also proposed restrictions of "Carefully Handle Objects: 0%" and "Handle with Fingers: 0%," both of which would appear to preclude Mr. Zavala from performing sedentary work.

42.    On September 29, 2020, Mr. Zavala appealed Defendants' September 4, 2020 decision to terminate his benefits. Mr. Zavala pointed out that he remains disabled because of physical problems from his two back surgeries, and that Dr. Deanda had certified such. Mr. Zavala explained in his appeal letter that, based upon the medical records that he enclosed (or had recently submitted), it was clear that he continued to treat with physicians after September 16, 2020, and Dr. Deanda continued to certify that he remained disabled from working.

43.    On October 15, 2020, Mr. Zavala underwent a cervical spine MRI, which revealed C5-C6 decompression and mild disc bulges at C3-C4, C4-C5, and C-6, with moderate stenosis at those levels.

44.    On November 19, 2020, Dr. Deanda examined Mr. Zavala and provided him with an updated letter of support, stating that Mr. Zavala's disability is due to a constellation of symptoms, mostly due to chronic pain that includes a concurrent diagnosis of depression. Mr. Zavala's chronic pain prohibits gainful employment, and the medications used to treat the pain would also affect his ability to be employed. Specifically, Dr. Deanda opined that Mr. Zavala has functional restrictions; namely, he cannot walk for an extended period of time without proper head support and neck support, and is unable to lift more than 5 pounds in an eight-hour day. Mr. Zavala was able to bend at the waist, but was limited in use of the knees due to osteoarthritis of the knee. He could not squat or kneel.

45.     On November 25, 2020, Mr. Zavala underwent another MRI of his cervical spine.  This MRI of Mr. Zavala's cervical spine indicated several problems with his cervical spine, and one of Sedgwick's physician reviewers indicated that this showed a "mass effect at the cord at multiple levels, and examinations by Dr. Kim reported the claimant to have diminished sensation at the left forearm and dorsum of the hand."  This MRI was largely consistent with the MRI from the previous month but indicated that the degree of right foraminal narrowing appeared to be slightly increased since the previous exam.  The reviewer, Dr. Anita M. Bajaj, noted that this may be due to differences in the imaging technique, or it may be an increase in the degenerative changes.

46.     On December 7, 2020, Dr. Wojtanowicz (psychiatrist) provided Mr. Zavala with a letter supporting his continuing disability diagnosis.  He agreed with the assessment made by Dr. Deanda that Mr. Zavala suffers from anxiety and depression that contribute to the constellation of symptoms that Dr. Deanda had assessed as prohibiting gainful employment.  Dr. Wojtanowicz noted that Mr. Zavala's depression and anxiety occur in the context of chronic pain.

47.     On December 13, 2020, Dr. Bryan Lee (an anesthesiologist/pain medicine doctor) examined Mr. Zavala and provided him with a letter supporting his continuing disability diagnosis.  Dr. Lee diagnosed him as having failed neck surgery syndrome, a malady not mentioned in reports from other medical providers.  Dr. Lee stated that the MRIs of the cervical spine demonstrate degenerations that correlate with Plaintiff's pain.  Dr. Lee pointed out that chronic pain is a very subjective condition.  Mr. Zavala's pain score was 8/10, even at rest and on pain medications.  Thus, Dr. Lee also considered Mr. Zavala to be disabled.

48.     On January 19 and 28, 2021, Mr. Zavala provided supplemental explanations of his disability to Defendants.  He stated that he was unable to work due to his ongoing neck, shoulder and hand pain, which had worsened, and that the medications that he took made him drowsy, dizzy and sleepy and occasionally gave him vertigo.  He reported that there was no job available that could accommodate his condition.  He stated that the previous denials of his disability benefits had increased his anxiety and depression, which had added to the psychological difficulties related to the limitations caused by his chronic pain.

49.     In response to Mr. Zavala's appeal and supplemental documentation that supported his disability diagnosis, Sedgwick retained two physician consultants to review Mr. Zavala's medical records: Terry Troutt, M.D., a physical medicine, rehabilitation, and pain medicine doctor; and Marc A. Whaley, M.D., a psychiatrist. Sedgwick did not ask its medical consultants to perform an IME of Mr. Zavala, but rather only a file "paper" review.

50.     On October 29, and December 29, 2020, and February 3, 2021, Dr. Troutt prepared a report and then two addenda of his opinions after reviewing Mr. Zavala's medical records.  Dr. Troutt never spoke with Mr. Zavala or his treating physicians.  Based purely on his file review, Dr. Troutt concluded that "[T]he claimant is not disabled from performing any occupation as of 09/16/2020."  Dr. Troutt's cursory rationale in its entirety is just one short paragraph, which states:

> This is a male claimant diagnosed with complex regional pain syndrome, cervicalgia, osteoarthritis, anxiety, depression, and back pain.  He does have the residual functional capacity based upon available records reviewed to perform job duties entailing a sedentary gainful position.  The claimant is being treated through pain management of which appears [*sic*] to be receiving benefit from the medication regimen being prescribed.  Even though claimant does

Case No.:



exhibit some mild weakness to the left upper extremity and some pain associated with complex regional pain syndrome and history of cervical surgery, there is no reported inability to function in terms of medical regimen being utilized.  His strength to the upper left extremity was 4+/5.  There is [*sic*] no reported focal neurological deficits except some hypersensitivity and evidence of allodynia to the left first and second fingers.  It is noted that the medication regimen is effective to help control his pain.  Although the claimant does have limitations in terms of functional abilities, he is still capable of sedentary work activities during the period of review.  Therefore, based on the medical records reviewed and from the perspective of pain medicine, the claimant is not disabled from performing any occupation as of 09/16/2020.

51.     Dr. Troutt's opinions lack adequate foundation, are based on erroneous assumptions, and are not credible.  First, he never examined Mr. Zavala in-person or spoke with him or his attending physicians; rather, he conducted a mere "paper review" of his medical records.  Second, Dr. Troutt failed to adequately address the most recent MRI of Mr. Zavala's cervical spine from October 15, 2020, which revealed C5-C6 decompression and mild disc bulges at C3-C4, C4-C5, and C-6, with moderate stenosis at those levels.  Dr. Troutt noted this MRI among the records reviewed in conjunction with his opinions, but he failed to discuss or distinguish this objective imaging study in his report, likely because it would undermine his conclusion that Mr. Zavala is not disabled.  Third, while Dr. Troutt noted Dr. Deanda's September 17, 2020 residual functional capacity form, he failed to properly summarize, discuss, or distinguish Dr. Deanda's proposed functional restrictions that would clearly affect Mr. Zavala's ability to perform even sedentary work:  "Without proper head and neck support, patient is unable to sit for longer than one hour at a time with one hour of rest in between.  If patient is required to move head or neck, or use arms or hands, patient can only sit for 15 min at a time with one hour of rest in between."  Dr. Troutt also neglected to even mention, let alone analyze, Dr. Deanda's proposed restrictions of "Carefully Handle Objects: 0%" and "Handle with Fingers: 0%," both of which would be involved in sedentary

Case No.:



work.  At a minimum, Dr. Troutt should have suggested reasonable accommodations that would have allegedly provided proper head and neck support, and explained the accommodations that would allegedly allow Mr. Zavala to perform sedentary work – particularly regarding typing and other fine motor skills – with only the use of his non-dominant right hand.  Alternatively, Dr. Troutt should have explained how Mr. Zavala could allegedly perform sedentary work involving fine motor skills despite the acknowledged "hypersensitivity and evidence of allodynia to the left first and second fingers."  Dr. Lee's December 13, 2020 letter supporting Mr. Zavala's disability diagnosis, which Dr. Troutt reviewed, further corroborates these findings, noting that "Patient has great difficulties with any tasks involving use of his hands, including daily activities of living, cooking, cleaning, personal hygiene and putting on his cloth [*sic*]."  Notably, Dr. Troutt's summary of this letter omits any mention whatsoever of Mr. Zavala's difficulty with using his hands, likely because it would undermine his conclusion that Mr. Zavala could perform sedentary work.

52.     Dr. Troutt also failed to logically explain how Mr. Zavala could perform sedentary work despite his acknowledged medical problems.  He concluded in a cursory, unsupported fashion that the medical findings were insufficiently severe – while glossing over or simply ignoring evidence to the contrary from Mr. Zavala's treating physicians (who concluded that he was disabled from performing his job duties), and without accounting for Mr. Zavala's corroborative complaints that his severe pain was exacerbated by bending his neck and typing on a computer.

53.     On the McGill Pain Index, CRPS ranks 42 out of 50, making it one of the most severe pain conditions of all, even rated more painful than childbirth and



amputation.[4]  CRPS has been nicknamed the "suicide disease" because the pain is "so severe that it has been known to drive people to the brink of death"[5] and because it is "the worst pain ever inflicted on a human being."[6]  "Excruciating pain is a hallmark of the disease . . . intense pain . . . characterized as aching, burning, pricking, or shooting."[7]  Thus, simply obtaining the sedentary employment that Dr. Troutt suggests Mr. Zavala can perform is not even remotely a realistic option. Mr. Zavala's physicians continued to prescribe him nerve pain medications because, in their opinion, taking those strong medications is a medically necessary treatment that effectively helps him to cope, at least somewhat, with his severe, chronic, debilitating CRPS pain.

54.    On October 29 and December 29, 2020 and February 3, 2021, Dr. Whaley prepared a report and then two addenda of his opinions after performing only a file "paper" review, just like the Defendants' other medical consultant, Dr. Troutt.  Dr. Whaley arrived at the same conclusion, that "from a psychiatric perspective, the claimant is not disabled from performing any occupation as of 09/16/2020."  Of course, this is an extremely misleading conclusion, as Mr. Zavala's depression and anxiety are secondary to his severe, chronic pain that renders him disabled and prevents him from living a normal life.  Mr. Zavala admitted as much in his December 20, 2020 letter to Defendants: "I have never claimed to be out on

---

[4] *See* Reflex Sympathetic Dystrophy Syndrome Association's Apr. 25, 2018 press release, "Suicide Disease Unites New Yorkers for 3rd Annual Awareness Walk Event, Complex Regional Pain Association Hosts Long Island Fundraiser for Rare Neurologic Disorder," found at rsds.org, uploads, 2018/04, Suicide Disease-United-New York.
[5] *Id.*
[6] *See* "Suicide Disease: The most painful condition on earth," in *The Queensland Times*, Apr. 16, 2017, by Lisa Mayoh, located at *https://www.qt.com.au/news/crps-worst-pain-scale/3167233/*.
[7] *See* "Complex Regional Pain Syndrome: Manifestations and the Role of Neurostimulation in Its Management," pp. S20-21, in *Journal of Pain and Symptom Management*, Vol. 31, No. 4S, April 2006, by Michael Stanton-Hicks, Department of Pain Management, The Cleveland Clinic Foundation, located at *https://www.jpsmjournal.com/article/S0885-3924(05)00678-0/fulltext*.

disability solely because of anxiety and depression.  My claim has always been about severe chronic pain in my neck, shoulder into my left arm and hand.  The anxiety and depression are a result of living with chronic pain and the negative impact my condition has had on my ability to work, my finances, my marriage, and other relationships . . . my psychiatrist's letter (Dr. Wojtanowicz) supports my position."

55.    On August 21, 2020, Eden DeGenova, an ADA Accommodation Specialist for Sedgwick, prepared a Transferable Skill Assessment ("TSA") report after performing only a file review, just like the Defendants' medical consultants. Based thereon, Ms. DeGenova concluded in her incredibly vague employability assessment report that Mr. Zavala could transition into five gainful sedentary positions in the Cerritos, California labor market: sales representative, telephone; sales rep. telecommunications; sales representative, cable; customer service manager; and customer service rep. special calls.  Defendants relied entirely on this report for vocational issues.  But, as explained below, its conclusion is obviously and indisputably flawed; therefore, Defendants improperly terminated Mr. Zavala's benefits without having any reasonable basis by relying on this report, because it is patently defective on its face.

56.    First, Ms. DeGenova's analysis is flawed *ab initio*, because she was given the following inaccurate information to prepare her report which she assume were true: "Mr. Zavala has restrictions/limitations of sedentary work only."  In fact, Mr. Zavala could *not* perform a full range of sedentary work, given his severe chronic neck and left-hand pain, along with osteoarthritis in his knees.  Because of this, even assuming arguendo that Mr. Zavala could somehow return to work, he would require substantial accommodations to provide him with proper neck and back support, and further accommodations that would allow him to effectively work

Case No.:



at a sedentary position (including typing) while using only his non-dominant right hand.  Additionally, it does not appear that Ms. DeGenova was informed about Mr. Zavala's CRPS, as the only medical conditions listed in her report are depression, GAD (generalized anxiety disorder), and cervical radiculopathy.  Notably, cervical radiculopathy is a far less severe and less permanent condition than CRPS.  Unfortunately, Ms. DeGenova's TSA does not include any discussion of whether any of the jobs selected could accommodate any of Mr. Zavala's's significant work restrictions.  Thus, the TSA is effectively useless because Defendants provided Ms. DeGenova with inaccurate and incomplete information.

57.    Second, any implicit conclusion by Defendants' vocational consultant that Mr. Zavala has the transferable skills to satisfactorily perform these five sedentary occupations is not credible because her opinions are missing crucial foundation.  Conspicuously, glaringly and fatally, she never disclosed in her opinion report the job duties of those five occupations, or the skills required to perform them.  That is improper.  *See Turner v. Life Insurance Co. of North America*, 2017 WL 6000099, at *3–4 (W.D. Wash. Dec. 4, 2017) (holding that a vocational consultant must define the duties of the other "any occupations" in his transferable skills assessment, including whether full-time work is required).  The TSA does not list the specific skills necessary for each of the five occupations listed, despite Ms. DeGenova apparently concluding in the vague report that Plaintiff has the transferable skills to perform each of them.  The requisite job duties and skills of these alternate occupations are nowhere in Ms. DeGenova's report, Defendants' denial letters, or Defendants' claim file.  The consultant does not identify the duties of those alternate occupations or compare them to Mr. Zavala's job skills and work experience.  Instead, she implicitly asks Defendants[8] (and a court) to trust her undisclosed analysis and thus-unsupported conclusion that Mr. Zavala has the

---

[8] One of whom is her direct employer, Sedgwick.

Case No.:

transferable work and education skills to adequately perform in any of the five positions listed previously.  Again, at a minimum, a facially plausible report would have at least explained how Mr. Zavala could be accommodated in each of these jobs for the limited use of his left hand, let alone for his neck, back, and knee conditions.  For this reason, Ms. DeGenova's opinion lacks foundation, is not credible, is indisputably flawed, is obviously unsupported on its face, and should never have been accepted by Defendants to terminate Mr. Zavala's disability benefits without investigating further.

58.     Third, a vocational analysis completed by an *independent* vocational expert arrived at a conclusion that was the opposite of that of Defendants' biased employee vocational consultant.  It undermines the vocational findings upon which Defendants' benefits decision was based.  Marcus Molinar, an impartial vocational expert with over 20 years' experience, testified at the Social Security hearing on September 23, 2021 concerning Mr. Zavala's claim for Social Security Disability Income ("SSDI"), after Defendants terminated Mr. Zavala's Plan benefits.  That neutral expert, who had no incentive to find for or against Mr. Zavala, testified that no jobs existed in the entire national economy (not just the local labor market) that a person with Mr. Zavala's age, education, work experience, and medical work limits could obtain.  He testified that Plaintiff could not perform the position of project manager – a sedentary position that Mr. Zavala had held in the past – and that given Mr. Zavala's age, education, work experience, and residual functional capacity, there were no jobs available in the entire nation that he could realistically obtain. While Defendants admittedly did not have the benefit of this determination before terminating Mr. Zavala's claim and then denying his subsequent appeal, it is strong evidence that Defendants made the wrong benefits decision.

-21-

59.    On February 5, 2021, Defendants reaffirmed their initial decision to terminate Mr. Zavala's disability benefits, effective September 16, 2020, and denied his appeal.

60.    Defendants' appeal denial relied upon the opinions of its three biased consultants (Dr. Troutt, Dr. Whaley, and Eden DeGenova)[9] to support their erroneous conclusion that "Although some findings are referenced, none are documented to be so severe as to prevent you from performing any occupation as of September 16, 2020."

61.    In the key portion of their appeal denial, Defendants reasoned that while its three consultants conceded that Mr. Zavala continued to have medical problems after September 16, 2020, they also concluded that the records did not contain evidence of functional limits that were severe enough to prevent Mr. Zavala from performing any occupation:

> Terry Troutt, MD, a board certified specialist in physical medicine & rehabilitation and in pain medicine, conducted a review of the medical records on file as part of the appeal process . . . The specialist noted you were diagnosed with complex regional pain syndrome (CRPS), cervicalgia, osteoarthritis, anxiety, depression, and back pain.  Dr. Troutt noted that although you exhibited some mild weakness to your left upper extremity and some pain associated with complex regional pain syndrome and history of cervical surgery, there was no reported inability to function in terms of the medical regimen being utilized.  He noted that there were no reported focal neurological deficits except some hypersensitivity and evidence of allodynia to your left first and second fingers.  Also, he indicated that there was no evidence of recent

_____

[9] Significantly, Eden DeGenova was employed by Sedgwick as an "ADA Accommodation Specialist" at the time when the TSA report was prepared.  This is a direct conflict of interest, because both Sedgwick (to save the Plan money by denying Mr. Zavala's claim) and Ms. DeGenova (to maintain her employment with Sedgwick) had a direct financial incentive to find jobs that Mr. Zavala could purportedly perform.



significant cervical spine range of motion (ROM) loss, focal neurological deficits of radiculopathy or CRPS. He noted that your cervical spine MRI on November 25, 2020, revealed no acute pathological findings and the thoracic and lumbar spine MRIs on December 31, 2020, revealed degenerative changes with no report of myelopathic changes, no acute pathological findings and no nerve root entrapment. The specialist noted that although there is evidence of limitations in terms of functional abilities, you are still capable of sedentary work activities.

Marc A. Whaley, MD, a board certified specialist in psychiatry, also reviewed the available medical information . . . Dr. Whaley noted you were diagnosed with major depressive disorder (MDD) and generalized anxiety disorder (GAD). The specialist noted you were seen on April 16, 2020 for chronic depression and anxiety, which would vary according to severity and come and go in episodic fashion over many years. Also, he noted that you had not been involved in consistent psychopharmacology or psychotherapy; however, mention was made of your neuropathic pain that had also been chronic in recent time. Dr. Whaley noted that as of August 28, 2020, you were described as having normal affect and speech. Additionally, he noted that there was a lack of descriptive data about the nature and extent of any depressive and anxiety symptomatology and no mental status findings that might illustrate possible functional impairment.

A transferable skills assessment was completed by a Certified Rehabilitation Consultant [Eden DeGenova] on August 21, 2020, based on your training, education, and restrictions and limitations. The following alternative occupations for which you would be qualified to perform were identified: [the list of the five sedentary occupations discussed above is omitted].

62.    Defendants relied entirely upon the opinions of its three consultants. Defendants' cursory letter is just two-and-one-half pages and contains no analysis, summary, or discussion of Mr. Zavala's medical records (despite Defendants concluding that the records purportedly are not sufficient to establish Mr. Zavala's disability). In short, Defendants' benefits decision was not well reasoned, entirely conclusory and without foundational support, relying only on the opinions of its

-23-

Case No.:



three consultants, which are not credible for the reasons described above.

63.     The opinions of Defendants' biased "paper reviewers" are far less credible than Mr. Zavala's highly qualified treating physicians.  As detailed above, the medical evidence overwhelmingly establishes that at all times relevant, Mr. Zavala was and is disabled from engaging in any type of occupation.  Instead of accepting the medical records of his highly respected treating physicians who certified his disability, Defendants relied on the opinions of seven biased medical consultants - Drs. Grattan, Trombly, Witham-Leitch, and Qadir in connection with the initial benefits denial; and Drs. Troutt and Whaley and Eden DeGenova in connection with the appeal denial - all of whom conducted mere "paper reviews" of Mr. Zavala's medical records.  Their opinions are less credible than those of the physicians who examined Mr. Zavala in person, who treated him for years and who, therefore, are far better suited to render credible opinions.

64.     There are many problems with the conclusions of Defendants' "paper reviewers" and thus Defendants' benefits decision that is based on their reports.  First, Drs. Grattan,[10] Trombly, Witham-Leitch, Qadir, Troutt, Whaley, and the vendor through which Defendants retained all of them, NMR,[11] is Defendants' paid consultant used repeatedly by Defendants and other insurers in the past to give disability opinions.  NMR[12] caters to the insurance industry, according to its website.  Dr. Grattan has been repeatedly criticized by federal judges in disability

---

[10] *See, e.g., Paquin v. Prudential Ins. Co. of Am.*, 2018 WL 3586397, at *4 (D. Colo. July 26, 2018) ("Dr. Grattan reviewed files for Prudential at least 54 times in" 2014-2015).

[11] A Westlaw search shows that several different insurance companies have retained NMR over 100 times in the last several years, just in published cases.  This number is of course likely much larger than 100.

[12] *See https://www.nmrco.com/.*  The website specifically states: "We provide specialized Peer Review solutions for our client base consisting of third-party administrators, insurance carriers, employers, state and federal agencies." *https://www.nmrco.com/peer-review-services.*

cases for his opinions in past cases.[13]  Again, it bears repeating that Defendants retained *all six* doctors who conducted "paper reviews" of Mr. Zavala's medical records during Defendants' internal claim review and appeals processes through NMR, an insurance industry consultant.  Additionally, Defendants' vocational expert, Eden DeGenova, was a full-time Sedgwick employee (a relationship Defendants failed to disclose in their February 5, 2021 appeal denial letter).  A court will review Defendants' claim denial with skepticism because they relied on financially conflicted, biased consultants who are sold out to the insurance industry,[14] along with the self-serving opinion of one of Defendants' own employees.

65.    The administrative record is replete with progress notes, off-work status reports, reports certifying that Mr. Zavala is disabled, and other medical records from Drs. Deanda, Kim, and Wojtanowicz, and his other treaters who documented his severe neck, shoulder, arm and hand conditions, osteoarthritis in his knees, plus depression and anxiety, resulting in functional limits and inability to perform his job – or any other job – during the relevant period of September 16, 2020 onward.  Instead of giving proper credence to the medical records of the health

---

[13] *See, e.g., Paquin*, 2018 WL 3586397, at *7 (rejecting Dr. Grattan's opinion and finding that insurer abused its discretion by relying on it); *Harlow v. Metro. Life Ins. Co.*, 2019 WL 1894752, at *12 (C.D. Cal. Mar. 11, 2019) ("the Court does not find the Dr. Grattan restrictions persuasive" because he failed to provide any detail or explanation for his opinions and did "not adequately consider Plaintiff's medical records"); *Miller v. PNC Fin. Servs. Grp., Inc.*, 278 F. Supp. 3d 1333, 1344-45 (S.D. Fla. 2017) (the court rejected Dr. Grattan's opinions because the evidence was "contrary to [his] conclusions," he ignored plaintiffs medical evidence, did "zero analysis of those [medical] reports," and failed to explain how he arrived at his opinions or why he disagreed with the plaintiff's doctors); *Brainard v. Liberty Life Assurance Co. of Bos.*, 173 F. Supp. 3d 482, 492 (E.D. Ky. 2016) ("Dr. Grattan's report is conclusory and not well reasoned;" most of his report just summarizes the medical record but his analysis of those records "is hardly half a page in length"); *Thoma v. Fox Long Term Disability Plan,* 2018 WL 6514757, at *27 (S.D.N.Y. Dec. 11, 2018) (the court rejected Dr. Grattan's opinion because he "offered little by way of substantive analysis").
[14] *See Demer v. IBM*, 835 F.3d 893, 901-03 (9th Cir. 2016); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).

Case No.:



care providers who treated and examined Mr. Zavala, Defendants relied on the opinions of medical consultants who only conducted "paper reviews" of Mr. Zavala's medical records without ever having examined him or spoken with him or his treating providers.  The paper reviewers' opinions are erroneous and less credible than those of Mr. Zavala's treating doctors, and they did not provide ample support for the Defendants' claim decision.

66.     A disability insurer's decision to deny a claim, based solely on the "paper reviews" of its own consultants has been criticized by the Ninth Circuit. *Montour v. Hartford Life & Accident*, 588 F.3d 623, 630 (9th Cir. 2009) (citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).  An administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians."  *Id.*; *see also Michaels v. Equitable Life Assur. Soc.*, 305 F.App'x 896, 906-07 (3d Cir. 2009) (questioning an administrator's choice to give determining weight to the conclusions of experts' paper-review reports over the conclusions of claimant's treating physicians).

67.     Four treating physicians (Drs. Deanda, Kim, Lee, and Wojtanowicz), each of whom has actually examined Mr. Zavala numerous times over the course of multiple years, have concluded that he is disabled from performing his own regular occupational duties as a Sales Executive 2 Fiber at Pacific Bell during the relevant post-September 16, 2020 period because of his chronic, severe neck, shoulder, arm and hand/finger pain and numbness, which pain is exacerbated by bending his neck and typing, as well as osteoarthritis in his knees, plus depression and anxiety due to his severe, chronic pain.  The opinions of these health care professionals, who have examined the patient and spoken with him in detail, carry far more weight than Defendants' "paper reviewers."  *See Shannon Williams v. United of Omaha Life Ins. Co.*, 2013 WL 5519525, at *12 (N. D. Ala., Sept. 30, 2013), citing *Black & Decker*

Case No.:

*v. Nord*, 538 U.S. 822, 832 (2003) (While a court is not required to give deference to the opinion of a treating physician, it is required to evaluate the weight of each doctor's opinion based on the extent of the patient's treatment history with that doctor.). That court explained why the opinions of a treating physician are usually more credible:

> [D]irect contact with the patient over a period of time would provide a more thorough opportunity to assess her credibility regarding level of pain and the true pattern of her abilities. Therefore, in the instant case, the court will focus heavily on the opinions and treatment records of Williams' treating physicians . . . .

68.    As noted, Defendants' medical consultants did not examine Mr. Zavala, though Pacific Bell's Plan documents permitted it. That raises additional questions about the credibility of their opinions and the accuracy of the Defendants' benefits denial. *See Shaw v. AT&T*, 795 F.3d 538, 550 (6th Cir. 2015) ("[T]he failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, 'raise[s] questions about the thoroughness and accuracy of the benefits determination.'").

69.    Defendants' denial letters are wrong for another reason. Defendants changed their position about Mr. Zavala's disability status, from "disabled" to "not disabled," without significant evidence of a change in his medical condition. That was unequivocally improper. Applicable case law requires that "substantial evidence" must support a claim administrator's decision to terminate benefits in light of its initial finding of disability; the administrator must have new evidence of a significant change in circumstances, i.e., the claimant's condition significantly improved.[15] In this case, Pacific Bell paid Mr. Zavala disability benefits for over 15

---

[15] *See Fifield v. HM Life Ins. Co.*, 2012 U.S. Dist. LEXIS 140880, *21 (D.N.H. 2012) (ruling that it was improper for an administrator to determine that the

Footnote continues on next page…

Case No.:



months: from June 2019 to September 2020.  Based on his medical records, it concluded that he was disabled from performing his own occupational duties – or any occupational duties – during that entire time frame.  It then reversed course and denied his claim in September 2020, despite having no substantial new evidence establishing he could work, and the medical evidence continuing to strongly support his disability in the months following Defendants' benefits termination.

70.    Pacific Bell paid Mr. Zavala's disability claim for over 15 months based on pre-termination records, and except for the time periods immediately following Plaintiff's two back surgeries on June 4 and December 13, 2019, they are substantially identical to the post-termination medical records in terms of their findings about Mr. Zavala's medical condition and the foundation for the doctors' opinions (and in some ways are not as strong as alleged above).  Defendants' contention that there was insufficient medical evidence from September 2020 onward was nothing more than their pre-contrived, illogical excuse to improperly terminate Mr. Zavala's benefits.

71.    Moreover, Defendants' denial decision based upon Dr. Troutt's opinion was improper, because he required a higher standard of proof of disability than did Pacific Bell's Plan documents.  In *Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455,

---

claimant "was not disabled based on the same medical records that they deemed sufficient to support her disability," and ruling that the termination was not supported by "substantial evidence"); *Saffon v. Wells Fargo*, 522 F.3d 863, 871 (9th Cir. 2008) ("MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled. In order to find her no longer disabled, one would expect the MRIs to show an improvement, not a lack of degeneration."); *McOsker v. Paul Revere*, 279 F.3d 586, 589 (8th Cir. 2002) (The circuit court explained, "[w]e are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments."); *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir. 2001) ("Nothing in the claims record justified [the administrator's] decision that a change of circumstances warranted termination of the benefits it initially granted.").

Case No.:

1   459-60 (9th Cir. 1996), the Ninth Circuit ruled that requiring a claimant to meet a

2   standard that is not present in the plan's documents "effectively imposes a new

3   requirement for coverage," but because "an administrator lacks discretion to rewrite

4   the Plan," to do so is improper.  Here, Defendants and their peer reviewer, Dr.

5   Troutt, insisted on a heightened standard of objective evidence of disability that was

6   not required by the Plan: "acute pathological findings."

7

8       72.     The Plan defines "Medical Evidence" as "objective medical

9   information," which includes:

11      . . . results from diagnostic tools and examinations performed in
        accordance with the generally accepted principles of the health care
12      profession. In general, a diagnosis that is based largely or entirely on
        self-reported symptoms will not be considered sufficient to support a
13      finding of Disability. For example, reports of intense pain, standing
        alone, will be unlikely to support a finding of Disability, but reports of
14      intense pain associated with an observable medical condition that
        typically produces intense pain could be sufficient.

15

16  The Plan thus does not require "acute pathological findings" in order to establish

17  disability – just other types of objective evidence, such as the results of a treating

18  physician's exam that was not based entirely upon the patient's subjective

19  complaints.  Mr. Zavala satisfied the Plan requirement of Medical Evidence because

20  his attending physicians (Drs. Deanda, Kim, Lee, and Wojtanowicz) all concluded

21  that he was disabled, based upon objective X-rays, MRI images, an EMG/nerve

22  conduction study, his numerous physical exams, and tests for objective range of

23  motion, palpation and Spurling's maneuver, in addition to Mr. Zavala's subjective

24  complaints of severe pain.  Moreover, Defendants' denial decision specifically notes

25  that "the thoracic and lumbar spine MRIs on December 31, 2020, revealed

26  degenerative changes . . ." – which are an "observable medical condition" – that in

27  conjunction with his subjective complaints of severe pain should be sufficient to

28  corroborate Mr. Zavala's disability.

Case No.:



73.    Defendants and their medical consultant, Dr. Troutt, failed to logically explain why that objective evidence and the observations and opinions of Mr. Zavala's treating physicians are insufficient to establish his disability.  Accordingly, Defendants' benefits decision was improper.

74.    As additional evidence in favor of Mr. Zavala's disability diagnosis, a government agency, the Social Security Administration ("SSA"), found Mr. Zavala to be disabled under a disability standard similar to that in the Plan.  That is strong evidence that Defendants made the wrong decision by terminating Mr. Zavala's disability benefits.[16]

75.    To qualify for disability benefits, the Plan requires that Mr. Zavala prove that he is unable to perform the duties of "any employment for which you are qualified for or may reasonably become qualified based on education, training or experience" (that is expected to provide him with an income that exceeds 50% of his pre-disability earnings).  The Social Security Act has a similar standard: that Mr. Zavala prove that he cannot perform the duties of any gainful work for which he qualifies (that exists in the national economy and will provide him with minimal income that is much less than the income limits in the Plan), while considering his education and work experience.[17]  Mr. Zavala was awarded disability benefits by the SSA after an Administrative Law Judge ("ALJ") found him to be disabled under Social Security rules, based on live testimony[18] from an *impartial* vocational expert

---

[16] *See Rouleau v. Liberty Life*, 2017 WL 359466, at *7 (W.D. Mich., Jan. 25, 2017) ("In its de novo review, the Court weighs the SSA determination heavily.")
[17] *See Rowell v. Aviza*, 2012 WL 1672497, at *17 (N.D. Cal., May 14, 2012); 423 U.S.C. § 423(d)(1)(A); 423 U.S.C. § 423(d)(2)(A) (The standard for SSDI disability benefits: "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . .").
[18] The hearing was held telephonically on September 23, 2021 due to the COVID-19 pandemic.

Case No.:



1   (that no such gainful occupations exist in the entire national economy for which Mr.

2   Zavala qualifies) and from Mr. Zavala, as well as the ALJ's review of his medical

3   records.  Yet, while Defendants terminated his disability benefits, the SSA awarded

4   Mr. Zavala SSDI and "found that [he] became disabled under our rules on June 3,

5   2019" through at least 2024.  The SSA thus concluded that Mr. Zavala has been

6   disabled from performing any type of gainful work that exists in the entire national

7   economy during the relevant post-termination period of September 16, 2020

8   onward.  Most notably, the ALJ specifically found that the demands of Mr. Zavala's

9   past relevant work as a project manager – "sedentary in exertion and perform at

10  sedentary" – i.e., a fully sedentary position – exceeds Mr. Zavala's residual

11  functional capacity.[19]  That is strong, almost insurmountable evidence that Mr.

12  Zavala meets the Plan's disability standard, contrary to what Defendants concluded.

13

14          76.    On April 29, 2020, a second government agency, the U.S. Department

15  of Education ("USDE"), found Mr. Zavala to be "totally and permanently disabled"

16  under its rules and conditionally discharged $48,976 in FFEL Consolidated student

17  loans, which Mr. Zavala had taken out back in 2006 to further his education.[20]  The

18  applicable standard required to obtain this discharge is as follows:

19

20          To show that you are totally and permanently disabled for the purposes
            of this discharge, you may submit the TPD discharge application with a
21          certification from a physician that shows you are unable to engage in

22  _____

23  [19] The "project manager" position listed is, in fact, fully sedentary.  A 61-year-old
    SSDI claimant was recently denied benefits on appeal, on the basis that he could
24  perform this exact same sedentary project manager position – which he had never
    done before – despite his heart failure, diabetes, and degenerative joint changes.
    *Andrew W. v. Kijakazi*, No. 5:21-CV-01237-KES, 2022 WL 3287903, at *1, 3 (C.D.
25  Cal. Aug. 11, 2022).  Here, the ALJ found that the same position – which Mr.
    Zavala had actually held in the past – exceeded his residual functional capacity.

26  [20] The USDE subsequently changed its rules in September 2021, to allow for
27  automatic discharge for borrowers granted disability benefits by the SSA.  However,
    Mr. Zavala submitted his discharge application prior to this policy change, and
    before he was approved for SSDI.  Thus, Mr. Zavala's application was manually
28  reviewed and approved by USDE staff.

Case No.:

> any substantial gainful activity by reason of a medically determinable physical or mental impairment that (1) can be expected to result in death; (2) has lasted for a continuous period of not less than 60 months; or (3) can be expected to last for a continuous period of not less than 60 months.
>
> "Substantial gainful activity" is a level of work performed for pay or profit that involves doing significant physical or mental activities or a combination of both.[21]

As applied to Mr. Zavala, this means that his disability was expected to last until at least June 2024 (60 months after his initial date of disability) in order to qualify for a discharge.  This determination by the USDE is consistent with the SSA's finding that Mr. Zavala is disabled and further supports the fact that he has been continuously disabled from June 4, 2019 through the present day.

77.    On May 3, 2023, the USDE advised Plaintiff that he had fully met the requirements of the three-year post-discharge monitoring period and is no longer subject to further monitoring – confirming that he was still "totally and permanently disabled" under its standards as of that date.  Mr. Zavala's student loans were fully discharged due to his total and permanent disability, and the outstanding balance on his federal student loans was accordingly reduced from $48,976 to $0.

78.    Additionally, the disability benefits that Mr. Zavala had previously received from Defendants (and continues to be entitled to receive) were underpaid.

79.    The Plan states the following with respect to including commissions as regular pay for the purposes of disability benefit calculation:

> . . . if your compensation is ordinarily computed by including sales commissions, in addition to your rate of earnings, your Pay includes

---

[21] *See* https://fsapartners.ed.gov/sites/default/files/attachments/2019-07/HEALForm539.pdf

Case No.:

your average monthly sales commission (not including compensation for overtime) for the lesser of the following periods:

• The preceding twelve (12) months in the service of the Participating Company that employs you.
• The total preceding continuous period of service with your employing Participating Company.

80.    Defendants acknowledge that if Mr. Zavala is entitled to LTD benefits, commissions comprise a portion of his monthly salary; the only issue is how those commissions are calculated. To determine LTD benefits, Defendants calculated his base monthly salary plus commissions as $9,763.93 per month. According to an internal note in the claim file, Defendants made the following calculation to reach this amount: "$21,452.88/8 = $2,681.61 avg monthly commissions." However, this calculation completely excludes Mr. Zavala's final two trailing commissions for April 2019 (paid in June 2019) and May 2019 (paid in July 2019). This erroneous calculation resulted in him receiving a gross benefit of $5,858.36 per month in regular LTD benefits ($9,763.93 × 60%) plus $976.39 per month in Supplemental LTD benefits ($9,763.93 × 10%).

81.    The correct base salary calculation for LTD benefits should have been $10,470.03 per month, calculated as follows, to incorporate the two trailing commissions for April 2019 (paid in June 2019) and May 2019 (paid in July 2019): $27,101.57/8 = $3,387.70 avg monthly commissions. Accordingly, Mr. Zavala should have received a gross benefit of $6,282.02 per month in regular LTD benefits ($10,470.03 × 60%) plus $1,047.00 per month in Supplemental LTD benefits ($10,470.03 × 10%).

82.    To the extent that Defendants contend that the Plan language is ambiguous as to trailing commissions, the court should construe any ambiguity in



Mr. Zavala's favor and approve the higher amount, because Defendants drafted the Plan. *See, e.g.*, *Sands v. E.I.C., Inc.*, 118 Cal.App.3d 231 (1981) (The general rule in California is that ambiguities in the drafting of contracts are construed against the drafter.).

83. This means that Mr. Zavala was underpaid by $423.66 per month in regular LTD benefits and $70.61 per month in Supplemental LTD benefits during the entire time when he received LTD benefits from Defendants.

84. The proper standard of review is de novo. Any grant of discretionary authority contained in the Plan is void in light of California Insurance Code Section 10110.6, which provides, in relevant part:

> (a) If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.
>
> (b) For purposes of this section, "renewed" means continued in force on or after the policy's anniversary date.
>
> (c) For purposes of this section, the term "discretionary authority" means a policy provision that has the effect of conferring discretion on an insurer or other claim administrator to determine entitlement to benefits or interpret policy language that, in turn, could lead to a deferential standard of review by any reviewing court.
> ...
> (g) This section is self-executing. If a life insurance or disability insurance policy, contract, certificate, or agreement contains a provision rendered void and unenforceable by this section, the parties to the policy, contract, certificate, or agreement and the courts shall treat that provision as void and unenforceable.

85. This section, by its own terms, applies to any policy, certificate, contract or agreement that provides "disability insurance coverage" to "any

Case No.:



California resident," regardless of where it was offered, issued, delivered, or renewed. Here, no party disputes that Plaintiff is a California resident. As such, this section applies to the Plan contract documents at issue, so long as they were offered, issued, delivered, or renewed after the effective date of the statute (January 1, 2012) but before Plaintiff's claim accrued. *See Gonda v. The Permanente Med. Grp., Inc.*, 2014 WL 186354, at *2 (N.D. Cal. Jan. 16, 2014). No party disputes that Plaintiff's claim accrued on September 4, 2020, which is the date on which his claim was first denied. *See Grosz-Salomon v. Paul Revere Life Ins.*, 237 F.3d 1154 (9th Cir. 2001) (holding that an ERISA cause of action based on a denial of ERISA benefits accrues at the time when benefits are denied).

86.     Thus, the only issue is whether the Plan was offered, issued, delivered, or renewed on or after January 1, 2012 but before September 4, 2020. The Disability Program, a contract Plan document, became effective on or before June 2009 and then was replaced in September 2018 by an updated/amended version (effective January 1, 2019), as stated in the Disability Program's SPD. Moreover, the Umbrella Plan, which included the Disability Program, was amended on January 1, 2014. Thus, the Plan and the Disability Program were offered in their amended form during the relevant time frame.

87.     The Plan and the Disability Program were also renewed during the relevant time frame. For the purposes of Section 10110.6, a policy or other disability insurance coverage contract document automatically renews every year on its anniversary date. *See* Cal. Ins. Code § 10110.6(b) (providing that "renewed" means "continued in force on or after the policy's anniversary date"). The Disability Program states that the Plan year is from January 1 through December 31 (meaning it has an annual anniversary on January 1). The Plan thus renewed each year on its January 1 anniversary date. Because the Plan, including the Umbrella



Plan and Disability Program, was in effect at least since 2009 (as stated in the SPD), the Plan has renewed each year on January 1 from 2010 to the present and continuing.  This means that the Plan's renewal date falls within the relevant time period, because the Umbrella Plan and the Disability Program continued in force through January 1, 2012.  *See Gonda, supra* at 1093-94; *Polnicky v. Liberty Life Assur. Co. Of Boston*, 999 F.Supp.2d 1144, 1148 (N.D. Cal. 2013) (applying a de novo standard of review to an ERISA claim for denial of benefits because "[t]he Policy was continued in force after its January 1, 2012 anniversary date, [so] any provision in the Policy attempting to confer discretionary authority to Liberty Life was rendered void and unenforceable").  As such, any grants of discretion that can be deemed to be a part of the Plan are void and unenforceable, and thus, the denial of benefits at issue must be reviewed de novo.

88.    In a de novo review, "the burden of proof is placed on the claimant" to establish entitlement to plan benefits.  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).  "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she [qualified for benefits] under the terms of the plan."  *Id.* at 1295-96.  The trial court performs an "independent and thorough inspection" of the plan administrator's decision in order to determine if the plan administrator correctly or incorrectly denied benefits.  *Silver v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006).  De novo review permits the trial court to "evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir.1999).

89.    Regardless of the standard of review that this Court applies, Defendants reached an incorrect decision, given the overwhelming medical records and other

evidence presented during the claim that established that Mr. Zavala was and is disabled within the meaning of the Plan.  Defendants' denial letters collectively (1) failed to credit the overwhelming medical evidence supporting Mr. Zavala's ongoing claim for STD benefits; (2) failed to show substantial evidence of improvement in Mr. Zavala's condition; (3) improperly relied on "paper reviews" that lacked foundation; (4) were illogical and made incorrect assumptions instead of relying on the more credible opinions of numerous health care professionals who actually examined Mr. Zavala and concluded that he was disabled; and (5) improperly discounted Mr. Zavala's subjective complaints (which were corroborated by his doctors' opinions) while insisting on objective evidence that was not required by the Plan and simultaneously ignoring other objective evidence.

90.    Accordingly, Defendants conducted a biased claims investigation that was consistent with its conflict of interest, which failed to provide Mr. Zavala with a full and fair review of his claim, which is a violation of ERISA.  This was made especially true by Defendants using a Sedgwick employee to conduct the TSA – a fact that was not disclosed in Defendants' February 5, 2021 appeal denial letter.[22]

91.    Mr. Zavala exhausted his administrative remedies under the Plan and now has the right to bring a legal action for benefits under ERISA Section 502(a). Sedgwick's February 5, 2021 denial letter on appeal stated as much, specifically, "If your appeal for benefits has been denied in whole or in part, you have the right to bring a lawsuit . . . under Section 502(a) of the Employee Retirement Income Security Act of 1974 . . . You have exhausted all mandatory appeal procedures under the Program.  Under the terms of the AT&T Disability Income Program for

_____

[22] Defendants' February 5, 2021 appeal denial letter simply refers to Ms. DeGenova as a "Certified Rehabilitation Consultant," without disclosing Ms. DeGenova's name or the fact that she was a Sedgwick employee.

Case No.:

Management Employees, a suit must be filed within five years of the date of denial by the Claims Administrator."

92.     Mr. Zavala is now and at all times relevant has remained "disabled" as defined in the Plan, and has at all times relevant convincingly demonstrated his total disability through medical records and other documents, information and correspondence.  Drs. Deanda and Beyer continue to certify him as disabled through the present day.

## **FIRST CAUSE OF ACTION**

To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest
under an ERISA Plan – 29 U.S.C. sections 1132(a)(1)(B), (g)(1)
(Plaintiff against Pacific Bell, Sedgwick, and Does 1 through 10)

93.     Plaintiff incorporates the previous paragraphs as though fully set forth herein.

94.     ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his rights to future benefits under the terms of a plan.

95.     At all times relevant, Plaintiff has been entitled to LTD benefits under the Plan.  By denying Plaintiff's claim for LTD benefits under the Plan, and by related acts and omissions, Defendants violated, and continue to violate, the terms of the Plan, and Plaintiff's rights thereunder.

Case No.:



96.     Defendants have failed to follow even the most rudimentary claims processing requirements of ERISA and of the Department of Labor Regulations, and have failed to conduct a "full and fair review" of the claim denial – an action required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in Defendants to make benefit determinations, no deference is warranted with regard to Defendants' handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

97.     A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. § 1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan.  *See* 29 U.S.C. Section 1104(a)(1).  Under ERISA: (1) a fiduciary must perform its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are adverse to the interests of the Plan, its participants, or its beneficiaries.  Defendants' handling of Plaintiff's disability benefit claim falls far short of these standards.

98.     For all of the reasons set forth above, the decision to deny disability insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational, contrary to the evidence, contrary to the terms of the Plan, and contrary to law.  Defendants abused their discretion by deciding to deny this claim, as the evidence shows that their denial decision was arbitrary and capricious.  Further, Defendants' denial decision and related actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life*



*Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008). Defendants' denial of Plaintiff's claim constitutes an abuse of discretion.

99. Alternatively, Plaintiff has met the burden of establishing that he is disabled due to symptoms including left-sided neck, shoulder, arm, elbow, wrist, hand and finger pain and numbness, as well as associated depression from his chronic pain and his other symptoms set forth above, all of which have plagued him from June 4, 2019 to the present day.

100. As a direct and proximate result of Defendants' denial of disability benefits, Plaintiff has been deprived of LTD benefits from September 16, 2020 onward.

101. As a direct and proximate result of the denial of his claim for LTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section 1132(g)(1).

102. A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to LTD benefits. Plaintiff seeks the declaration of this Court that he meets the Plan definition of "disability" and is entitled to benefits under the Plan. In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim that is consistent with the terms of the Plan.

103. Plaintiff alleges all of the same conduct against Does 1 through 10 that it does against Pacific Bell and Sedgwick in this First Cause of Action and in this Complaint.

Case No.:





# PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1. For all Plan benefits due and owing to Plaintiff, including LTD benefits;

2. For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g);

3. For pre-judgment and post-judgment interest on the principal sum, accruing from the date on which the obligations were incurred. *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992). Specifically, Plaintiff seeks interest at the rate of 10% per annum pursuant to California Insurance Code Section 10111.2; and

4. For such other and further relief as this Court deems just and proper.

Dated:  July 17, 2023                    MCKENNON LAW GROUP PC

                                         By: _____
                                             ROBERT J. McKENNON
                                             ERIK C. FRITZ
                                             Attorneys for Plaintiff,
                                             SALVADOR ZAVALA

Case No.:

